## WONG WING *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 204. Argued April 1, 2, 1896. — Decided May 18, 1896.

Detention or temporary confinement, as part of the means necessary to give effect to the exclusion or expulsion of Chinese aliens is valid.

The United States can forbid aliens from coming within their borders, and expel them from their territory, and can devolve the power and duty of identifying and arresting such persons upon executive or subordinate officials; but when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused.

ON July 15, 1892, Wong Wing, Lee Poy, Lee Yon Tong and Chan Wah Dong were brought before John Graves, a commissioner of the Circuit Court of the United States for the Eastern District of Michigan, by virtue of a warrant issued upon the complaint of T. E. McDonough, deputy collector of customs, upon a charge of being Chinese persons unlawfully within the United States and not entitled to remain within the same. The commissioner found that said persons were unlawfully within the United States and not entitled to remain within the same, and he adjudged that they be imprisoned at hard labor at and in the Detroit house of correction for a period of sixty days from and including the day of commitment, and that at the expiration of said time they be removed from the United States to China.

A writ of *habeas corpus* was sued out of the Circuit Court of the United States, directed to Joseph Nicholson, superintendent of the Detroit house of correction, alleging that said persons were by him unlawfully detained; the superintendent made a return setting up the action of the commissioner; and, after argument, the writ of *habeas corpus* was discharged, and the prisoners were remanded to the custody of said Nicholson, to serve out their original sentence. From this decision an appeal was taken to this court.

*Mr. Frank H. Canfield* for appellants. *Mr. Frederick W. Fielding* was on his brief.

*Mr. Assistant Attorney General Dickinson* for appellees.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

By the thirteenth section of the act of September 13, 1888, c. 1015, 25 Stat. 476, 479, it was provided as follows: "That any Chinese person, or person of Chinese descent, found unlawfully in the United States or its Territories, may be arrested upon a warrant issued upon a complaint under oath, filed by any party on behalf of the United States, by any justice,

judge, or commissioner of any United States Court, returnable before any justice, judge or commissioner of a United States court, or before any United States court, and when convicted, upon a hearing, and found and adjudged to be one not lawfully entitled to be or remain in the United States, such person shall be removed from the United States to the country whence he came."

The first section of the act of October 1, 1888, c. 1064, 25 Stat. 504, was in the following terms: " That from and after the passage of this act it shall be unlawful for any Chinese laborer who shall at any time heretofore have been, or who may now or hereafter be, a resident within the United States, and who shall have departed, or shall depart therefrom, and shall not have returned before the passage of this act, to return to, or remain in, the United States."

The validity of these acts was assailed because they were alleged to be in conflict with existing treaties between the United States and China, and because to deport a Chinaman who had, under previous laws, a right to return to the United States, was a punishment which could not be inflicted except by judicial sentence.

But these contentions were overruled and the validity of the legislation sustained by this court in the case of *Chae Chan Ping* v. *United States*, 130 U. S. 581. In this case it was held, in an elaborate decision by Mr. Justice Field, that the act excluding Chinese laborers from the United States was a constitutional exercise of legislative power; that, so far as it conflicted with existing treaties between the United States and China, it operated to that extent to abrogate them as part of the municipal law of the United States; and that a right conferred upon a Chinese laborer, by a certificate issued in pursuance of previous laws, to return to the United States could be taken away by a subsequent act of Congress.

On May 5, 1892, by an act of that date, c. 60, 27 Stat. 25, Congress enacted that all laws then in force, prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent, should be continued in force for a period of ten years from the passage of the act. The sixth

section of the act was, in part, in the following terms : " And it shall be the duty of all Chinese laborers within the limits of the United States, at the time of the passage of this act, and who are entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence, and any Chinese laborer, within the limits of the United States, who shall neglect, fail or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States as hereinbefore provided."

As against the validity of this section, it was contended that, whatever might be true as to the power of the United States to exclude aliens, yet there was no power to banish such aliens who had been permitted to become residents, and that, if such power did exist, it was in the nature of a punishment, and could only be lawfully exercised after a judicial trial.

But this court held, in the case of *Fong Yue Ting* v. *United States,* 149 U. S. 698, that the right to exclude or to expel aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation; that the power of Congress to expel, like the power to exclude, aliens or any class of aliens from the country may be exercised entirely through executive officers; and that the said sixth section of the act of May 5, 1892, was constitutional and valid.

The act of August 18, 1894, c. 301, 28 Stat. 372, 390, made provision for expenses of returning to China all Chinese persons found to be unlawfully in the United States, including the cost of imprisonment and actual expense of conveyance of Chinese persons to the frontier or seaboard for deportation,

and contained the following enactment: "In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final unless reversed on appeal to the Secretary of the Treasury."

One Lem Moon Sing, a person of the Chinese race, who claimed to have had a permanent domicil in the United States, and to have carried on business therein as a merchant before the passage of the act of August 18, 1894, and to have gone on a temporary visit to his native land with the intention of returning and continuing his residence in the United States — during which temporary absence the said act was passed — was, on his return, prevented from landing, and was confined and restrained of his liberty by the collector of the port of San Francisco. He filed in the District Court of the United States for the Northern District of California a petition for a writ of *habeas corpus*, wherein he alleged that he had not been apprehended and was not detained by virtue of the judgment, order, decree or other judicial process of any court, or under any writ or warrant, but under the authority alleged to have been given to the collector of the port of San Francisco by the act of August 18, 1894, and that his detention was without jurisdiction and without due process of law, and against his rights under the Constitution and laws of the United States. The writ of *habeas corpus* was denied by the court below, and from this judgment an appeal was prosecuted to this court.

The contention on behalf of the appellant in the case was thus stated by Mr. Justice Harlan, who delivered the opinion of the court:

"The contention is that while, generally speaking, immigration officers have jurisdiction under the statute to exclude an alien who is not entitled under some treaty or statute to come into the United States, yet if the alien is entitled, of right, by some law or treaty, to enter this country, but is, nevertheless, excluded by such officers, the latter exceed their jurisdiction, and their alleged action, if it results in restraining

the alien of his liberty, presents a judicial question, for the decision of which the courts may intervene upon a writ of *habeas corpus.*"

In considering this position the court said:

" That view, if sustained, would bring into the courts every case of an alien who claimed the right to come into the United States under some law or treaty, but was prevented from doing so by the· executive branch of the government. This would defeat the manifest purpose of Congress in committing to subordinate immigration officers and to the Secretary of the Treasury exclusive authority to determine whether a particular alien seeking admission into this country belongs to the class entitled by some law or treaty to come into the country, or to a class forbidden to enter the United States. Under that interpretation of the act of 1894 the provision that the decision of the appropriate immigration or customs officers should be final, unless reversed on appeal to the Secretary of the Treasury, would be of no practical value.

"The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications."

Accordingly the judgment of the court below denying the application for the writ of *habeas corpus* was affirmed. *Lem Moon Sing* v. *United States*, 158 U. S. 538.

The present appeal presents a different question from those heretofore determined. It is claimed that, even if it be competent for Congress to prevent aliens from coming into the country, or to provide for the deportation of those unlawfully within its borders, and to submit the enforcement of the provisions of such laws to executive officers, yet the fourth section of the act of 1892, which provides that "any such Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States, shall be imprisoned at hard labor for a period not exceeding one year, and thereafter removed from the United

States," inflicts an infamous punishment, and hence conflicts with the Fifth and Sixth Amendments of the Constitution, which declare that no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, and that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.

It is argued that, as this court has held, in *Ex parte Wilson*, 114 U. S. 417, and in *Mackin* v. *United States*, 117 U. S. 348, that no person can be held to answer, without presentment or indictment by a grand jury, for any crime for which an infamous punishment may be imposed by the court, and that imprisonment at hard labor for a term of years is an infamous punishment, the detention of the present appellants, in the house of correction at Detroit, at hard labor for a period of sixty days, without having been sentenced thereto upon an indictment by a grand jury and a trial by a jury, is illegal and without jurisdiction.

On the other hand, it is contended on behalf of the Government that it has never been decided by this court that in all cases where the punishment may be confinement at hard labor the crime is infamous, and many cases are cited from the reports of the state Supreme Courts, where the constitutionality of statutes providing for summary proceedings, without a jury trial, for the punishment by imprisonment at hard labor of vagrants and disorderly persons has been upheld. These courts have held that the constitutional guarantees refer to such crimes and misdemeanors as have, by the regular course of the law and the established modes of procedure, been the subject of trial by jury, and that they do not embrace every species of accusation involving penal consequences. It is urged that the offence of being and remaining unlawfully within the limits of the United States by an alien is a political offence, and is not within the common law cases triable only by a jury, and that the Constitution does not apply to such a case.

The Chinese exclusion acts operate upon two classes — one

consisting of those who came into the country with its consent, the other of those who have come into the United States without their consent and in disregard of the law. Our previous decisions have settled that it is within the constitutional power of Congress to deport both of these classes, and to commit the enforcement of the law to executive officers.

The question now presented is whether Congress can promote its policy in respect to Chinese persons by adding to its provisions for their exclusion and expulsion punishment by imprisonment at hard labor, to be inflicted by the judgment of any justice, judge or commissioner of the United States, without a trial by jury. In other words, we have to consider the meaning and validity of the fourth section of the act of May 5, 1892, in the following words: "That any such Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be and remain in the United States, shall be imprisoned at hard labor for a period of not exceeding one year, and thereafter removed from the United States, as hereinbefore provided."

We think it clear that detention, or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens would be valid. Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character and while arrangements were being made for their deportation. Detention is a usual feature of every case of arrest on a criminal charge, even when an innocent person is wrongfully accused; but it is not imprisonment in a legal sense.

So, too, we think it would be plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence, punishable by fine or imprisonment, if such offence were to be established by a judicial trial.

But the evident meaning of the section in question, and no other is claimed for it by the counsel for the Government, is that the detention provided for is an imprisonment at hard labor, which is to be undergone before the sentence of depor-

tation is to be carried into effect, and that such imprisonment is to be adjudged against the accused by a justice, judge or commissioner, upon a summary hearing. Thus construed, the fourth section comes before this court for the first time for consideration as to its validity.

It is, indeed, obvious, from some expressions used by the court in a previous opinion under the exclusion acts, that it was perceived that the question now presented might arise; but care was taken to reserve any expression of opinion upon it. Thus, in the case of *Fong Yue Ting* v. *United States*, 149 U. S. 730, Mr. Justice Gray used the following significant language:

" The proceeding before a United States judge, as provided for in section 6 of the act of 1892, is in no proper sense a trial and sentence for a crime or offence. It is simply the ascer-tainment, by appropriate and lawful means, of the fact whether the conditions exist upon which Congress has en-acted that an alien of this class may remain within the country. The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty or property, without due process of law; and the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application."

There is an evident implication, in this language, of a distinction between those provisions of the statute which contemplate only the exclusion or expulsion of Chinese persons and those which provide for their imprisonment at hard labor, pending which their deportation is suspended.

Our views, upon the question thus specifically pressed upon

our attention, may be briefly expressed thus: We regard it as settled by our previous decisions that the United States can, as a matter of public policy, by Congressional enactment, forbid aliens or classes of aliens from coming within their borders, and expel aliens or classes of aliens from their territory, and can, in order to make effectual such decree of exclusion or expulsion, devolve the power and duty of identifying and arresting the persons included in such decree, and causing their deportation, upon executive or subordinate officials.

But when Congress sees fit to further promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused.

No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial. It is not consistent with the theory of our government that the legislature should, after having defined an offence as an infamous crime, find the fact of guilt and adjudge the punishment by one of its own agents.

In *Ex parte Wilson,* 114 U. S. 428, this court declared that for more than a century imprisonment at hard labor in the state prison or penitentiary or other similar institution has been considered an infamous punishment in England and America, and that imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, "involuntary servitude for crime," spoken of in the provision of the Ordinance of 1787, and of the Thirteenth Amendment of the Constitution, by which all other slavery was abolished, and which declares

that such slavery or involuntary servitude shall not exist within the United States or any place subject to their jurisdiction, except as a punishment for crime whereof the party shall have been duly convicted.

And in the case of *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369, it was said: "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.' These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or nationality; and the equal protection of the laws is a pledge of the protection of equal laws." Applying this reasoning to the Fifth and Sixth Amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty or property without due process of law.

Our conclusion is that the commissioner, in sentencing the appellants to imprisonment at hard labor at and in the Detroit house of correction, acted without jurisdiction, and that the Circuit Court erred in not discharging the prisoners from such imprisonment, without prejudice to their detention according to law for deportation.

*The judgment of the Circuit Court is reversed and the cause remanded to that court with directions to proceed therein in accordance with this opinion.*

MR. JUSTICE FIELD, concurring in part and dissenting in part.

The majority of the justices, in this case, hold that whatever might be true as to the power of the United States to exclude aliens, yet there was no power to punish such aliens who had been permitted to become residents, and that, if such power did exist, it could only be lawfully exercised after a

judicial trial, and therefore that the accused were entitled to be discharged from their arrest and imprisonment. To that extent their opinion is concurred in.

But I do not concur, but dissent entirely from what seemed to me to be harsh and illegal assertions, made by counsel of the Government, on the argument of this case, as to the right of the court to deny to the accused the full protection of the law and Constitution against every form of oppression and cruelty to them.

Wong Wing, one of the petitioners on proceedings to be released from the alleged unlawful imprisonment, is a subject of the Chinese Government, with which the Government of the United States has relations of peace and amity. This Chinaman and three other persons of the same race and country were in the month of July, 1892, found within the city of Detroit, in the Eastern District of Michigan, and upon the complaint of the deputy collector of customs at that place, made to a United States Circuit Court commissioner for that district, that they were unlawfully within the limits of the United States, a warrant for their arrest was issued by the commissioner, and they were accordingly arrested and taken before him for inquiry into the correctness of the charge.

Upon examination before the commissioner upon the charge it was held by him that the Chinese persons named were unlawfully within the United States, and his judgment was that they should be imprisoned at hard labor in the house of correction at Detroit, in the Eastern District of Michigan, for a period of sixty days from and including that date, and that at the expiration of that period they should be removed from the United States to China.

The Chinese thus arrested and committed immediately applied to the judges of the United States court for the Eastern District of Michigan, for a writ of *habeas corpus*, to be released from their imprisonment and restraint of their liberty, alleging that the same were unlawful, without warrant of law and contrary to the Constitution and laws of the United States; and that they were made under the act of Congress

approved May 5, 1892, entitled "An act to prohibit the coming of Chinese persons into the United States."

The petitioners alleged that the proceedings and conviction were wholly without jurisdiction on the part of the commissioner and without warrant and authority of law. They therefore prayed that the writ might issue commanding the superintendent of the Detroit house of correction to forthwith bring the petitioners before the court and show cause, if any there be, why they should be further detained and deprived of their liberty. The writ was immediately issued and served upon the superintendent, commanding him to have the bodies of the arrested and imprisoned Chinese upon a day and hour designated before the court, together with the time and cause of such imprisonment and detention.

The superintendent immediately appeared before the court and produced the arrested and imprisoned persons with a copy of the commitment issued by the commissioner at a session of the Circuit Court of the United States for the Eastern District of Michigan, held pursuant to adjournment in the District Court room in the city of Detroit on Friday, the 22d day of July, 1892, Honorable Henry H. Swan, District Judge, being present, and after arguments of counsel were heard, the court ordered that the writ of *habeas corpus* be discharged, and that the persons arrested be remanded to the custody of Nicholson, the keeper of the District house of correction, to serve their original sentences.

The prisoners now allege that they are aggrieved by the decision of the court, and are advised that the judgment and order are erroneous upon the following, among other grounds:

First, because the commitment and imprisonment of the petitioners in the house of correction are unlawful and without warrant of law, and contrary to the Constitution and laws of the United States; that the proceedings and conviction of the petitioners before the commissioner were wholly without jurisdiction on his part, and without warrant or authority of law; that for these and other reasons appearing upon the face of the proceedings the petitioners, feeling themselves aggrieved by the judgment and decision of the Circuit Court,

appeal therefrom to the Supreme Court of the United States, and pray that the appeal may be allowed, and, in accordance with the rules and practice of that court, pending the appeal they may be admitted to bail, which prayer was granted.

The question involved is whether a Chinese person can be lawfully convicted and sentenced to *imprisonment at hard labor* for a definite period by a commissioner without indictment or trial by jury. The question involves the constitutionality of section 4 of the act of 1892.

It is submitted that this section is invalid because it conflicts with the Fifth Amendment of the Constitution, which declares that "no person shall be held to answer for a capital, or other infamous crime, unless on a presentment or indictment of a grand jury, . . . nor be deprived of life, liberty or property without due process of law," and also conflicts with the Sixth Amendment of the Constitution, which provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."

It does not follow that, because the Government may expel aliens or exclude them from coming to this country, it can confine them at hard labor in a penitentiary before deportation or subject them to any harsh and cruel punishment. If the imprisonment of a human being at hard labor in a penitentiary for any misconduct or offence is not punishment, it is difficult to understand how anything short of the infliction of the death penalty for such misconduct or offence is punishment. It would seem to be not only punishment, but punishment infamous in its character, which, under the provisions of the Constitution of the United States, can only be inflicted upon a person after his due conviction of crime pursuant to the forms and provisions of law.

Section 4 of the act of 1892 provides: "That any Chinese person or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States, shall be imprisoned at hard labor for a period not exceeding one year, and thereafter removed from the United

States, as hereinbefore provided," and whenever the law provides that imprisonment shall follow a trial and conviction of the offender, it necessarily intends that such imprisonment shall be inflicted as *punishment* for the offence of which the person has been convicted. Imprisonment at hard labor for a definite period is not only punishment, but it is punishment of an infamous character.

Imprisonment at hard labor in a state prison is also *servitude*, to which no person under the Constitution can be subjected except as a punishment for crime, whereof he shall have been duly convicted.

In *Ex parte Wilson*, 114 U. S. 417, the court said: "Imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, 'involuntary servitude for crime,' spoken of in the Ordinance of 1787 and of the Thirteenth Amendment of the Constitution, by which all other slavery was abolished."

In 2 Story on the Constitution, § 1924, it is said that this amendment "forbids not merely the slavery heretofore known to our laws, but all kinds of involuntary servitude not imposed in punishment for a public offence."

The provisions of the Fifth, Sixth and Thirteenth Amendments of the Constitution apply as well to Chinese persons who are aliens as to American citizens.

The term "person," used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic. A resident, alien born, is entitled to the same protection under the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws.

This has been decided so often that the point does not require argument. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *Ho Ah Kow* v. *Nunan*, 5 Sawyer, 552; *Carlisle* v. *United States*, 16 Wall. 147; *In re Lee Tong*, 18 Fed. Rep. 253; *In re Wong Yung Quy*, 6 Sawyer, 237; *In re Chow Goo Pooi*, 25 Fed. Rep. 77.

The contention that persons within the territorial jurisdic-

tion of this republic might be beyond the protection of the law was heard with pain on the argument at the bar — in face of the great constitutional amendment which declares that no State shall deny to any person within its jurisdiction the equal protection of the laws. Far nobler was the boast of the great French Cardinal who exercised power in the public affairs of France for years, that never in all his time did he deny justice to any one. "For fifteen years," such were his words, "while in these hands dwelt empire, the humblest craftsman, the obscurest vassal, the very leper shrinking from the sun, though loathed by charity, might ask for justice."

It is to be hoped that the poor Chinamen, now before us seeking relief from cruel oppression, will not find their appeal to our republican institutions and laws a vain and idle proceeding.

But whilst remarking upon and denouncing in the strongest language every form of cruelty and barbarity in the legislation or proceedings adopted for the expulsion or exclusion of Chinese from the country, who do not enter by the permission of the Government, in order to avoid a misconception of its authorized action in that respect the declarations of the court with regard to the aliens named as to their entrance and as to the time and manner of their departure are adopted.

And the statement of the court in the present case that the United States can, as a matter of public policy, by Congressional legislation, forbid aliens or classes of aliens from their territory, and can, in order to make effectual such legislation for their exclusion or expulsion, devolve the power and duty of identifying and arresting them, and causing their deportation upon executive or subordinate officials, is accepted as sound.

And the further views announced by the court that when Congress sees fit to promote such a policy by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, such legislation to be valid must provide for an arrest and trial to establish the guilt of the accused, are also accepted and adopted. "It is not consistent," as truly said by the court, "with the theory of our government that the legislature should after having defined an

offence as an infamous crime provide that the fact of infamy shall be established by one of its own agents."

MR. JUSTICE BREWER took no part in the decision of this case.